UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JEFFREY HARRIS,

        Petitioner,

   v.                                 Case No. 17-cv-663-pp

JUDY SMITH, Warden,
Oshkosh Correctional Institution

        Respondent.

**ORDER DENYING AS MOOT THE PETITIONER'S MOTION FOR AN
EVIDENTIARY HEARING (DKT. NO. 4), DENYING AS MOOT THE
PETITIONER'S MOTION TO APPOINT COUNSEL (DKT. NO. 11), GRANTING
THE RESPONDENT'S MOTION FOR EXTENSION OF TIME (DKT. NO. 17),
GRANTING RESPONDENT'S MOTION TO DISMISS THE PETITION AS
UNTIMELY (DKT. NO. 18), DENYING THE PETITIONER'S MOTION FOR
DEFAULT JUDGMENT (DKT. NO. 20), DECLINING TO ISSUE A
CERTIFICATE OF APPEALABILITY, DISMISSING PETITION FOR WRIT OF
*HABEAS CORPUS* UNDER 28 U.S.C. §2254 (DKT. NO. 1)
AND DISMISSING CASE**

On May 11, 2017, Jeffrey Harris filed a petition for writ of *habeas corpus*

under 28 U.S.C. §2254, challenging his 1978 conviction for first-degree

homicide as party to a crime. Dkt. No. 1. He alleged four grounds for relief: (1)

"Newly Discovered Evidence Recantation Evidence of the State's Witness,

Herbert Shropshire;" (2) "Newly Discovered Evidence of Charles Hart;" (3)

"Newly Discovered Evidence Of Mark Springfield;" and (4) ineffective assistance

of counsel. Dkt. No. 1 at 6-10. The petitioner asked the court for an evidentiary

hearing, dkt. no. 4, and asked the court to appoint counsel for him, dkt. no.

11. After Magistrate Judge Duffin screened the petition, the respondent filed a

motion for extension of time to file a motion to dismiss, dkt. no. 17, along with a motion to dismiss the petition as untimely, dkt. no. 18. The petitioner subsequently filed a motion for default judgment. Dkt. No. 20. The same day, the petitioner responded to the motion to dismiss, arguing that the court should allow his claims to proceed under the gateway of actual innocence. Dkt. No. 22. The court will grant the respondent's motion for extension of time, grant the respondent's motion to dismiss the petition as untimely, deny the petitioner's motions and dismiss the petition.

## I.    Background

The petitioner challenges a conviction from May 1978—almost forty years ago. In connection with their various pleadings and motions, the parties have presented documents from federal and state court proceedings spanning the four decades from the petitioner's original conviction date to the present. The court begins by examining this history.

### A.    State Court Proceedings

#### 1.    *Petitioner's May 1-4, 1978 Jury Trial*

On May 4, 1978, after a four-day trial, a jury found the petitioner guilty of attempted armed robbery as party to a crime and murder in the first degree as party to a crime for his role in the robbery of a liquor store and the shooting death of its owner, Gervis Myles. Dkt. No. 19-13 at 268.

The evidence at trial showed that on May 27, 1976, police officer Kenneth Darton responded to a call at the Great Western Liquor Store located at 1101 West Atkinson Avenue in Milwaukee, Wisconsin. Id. at 46. Officer Darton found

Gervis Myles lying on the floor in a pool of blood, with a bullet wound "in the center of his forehead just above the eyes." <u>Id.</u> at 48, 50. Officer Darton also observed an empty, open, zipper-type bank bag beneath the counter and coins scattered on the floor. <u>Id.</u> at 49.

Doctor Chesley P. Erwin testified at trial that he found a bullet wound in the victim's forehead, as well as "tattooing" or "stippling" around the victim's forehead, indicating "a relatively close distance of the shot." <u>Id.</u> at 67. The victim's wife, Gloria Myles, identified the body and, on cross-examination, testified that her husband kept a handgun at his store. <u>Id.</u> at 76-77.

An individual named Herbert Shropshire set the scene for the petitioner's involvement in the shooting. Shropshire testified that he had gone to Elnora Howze's home in the afternoon on May 27, 1976 and had found five individuals there: Mark Springfield, Trudy Joiner, Charles Hart, Elnore Howze and the petitioner. <u>Id.</u> at 81. He testified that the petitioner lived at Howze's home at that time. <u>Id.</u> Shropshire said that he knew the petitioner owned a handgun, and that he had seen the petitioner's handgun in Howze's home. <u>Id.</u> at 83. After arriving at Howze's home, Shropshire testified that he went to a bedroom with Hart and the petitioner, where they had a conversation about "how it is that they [could] make some quick money." <u>Id.</u> at 98. After the conversation, the petitioner and Hart left the home; Shropshire followed shortly after, and when he caught up with the pair, they informed Shropshire that they were going to rob the liquor store. <u>Id.</u> at 82, 84. Shropshire testified that he was to act as the lookout. <u>Id.</u> at 84-85.

3

Shropshire testified that Hart and the petitioner entered the store and "cas[ed] the place." Id. They left the store, told Shropshire that it looked easy, and instructed Shropshire to stay outside while they went back in. Id. at 85-86. Shropshire said that he then heard a gunshot, and saw Hart and the petitioner running out of the store. Id. at 86-87. He testified that he saw a gun in the petitioner's hand as the petitioner ran from the store. Id. at 87. After seeing Hart and the petitioner run from the store, Shropshire walked in a different direction, played some basketball in the park and eventually went back to Howze's house. Id. Back at Howze's, Shropshire testified that he saw the petitioner, Hart, Elnora Howze, Trudy Joiner, Mark Springfield and Donald Carter. Id. At Howze's home, Hart and the petitioner told Shropshire that it "went down wrong" and that they had had to kill the man. Id. at 89. On cross-examination, Shropshire admitted to previously providing a statement saying that the petitioner and Hart had told him "there was a struggle" and that "[Hart and the petitioner] had to shoot him[.]" Id. at 144. Shropshire also testified that, back at Howze's, the petitioner discussed dropping a gun on the way back to the home and that Donald Carter had gone to retrieve it. Id. at 90.

Elnora Howze testified that on May 27, 1976, Charles Hart, Herbert Shropshire, Mark Springfield and Donald Carter came to her home. Id. at 167. She testified that the petitioner had lived at her residence for around a year, and that on the day in question the petitioner had a gun in the bedroom of her house. Id. at 166-67She said that Shropshire, Hart and the petitioner held a conversation in her home, then left. Id. at 168. Howze testified that the

petitioner returned to the house with Hart and that "they appeared to have been running, tired." Id. at 169.

Howze said she did not immediately find out where the petitioner had been, but that the petitioner asked her to go get the gun that he had dropped. Id. at 170-71. She testified that the dropped gun was the same gun that the petitioner kept in her bedroom. Id. at 171. Howze went with Charles Hart to try to retrieve it, but could not find the gun. Id. She went to look for the gun a second time with Donald Carter, but again could not find the gun. Id. at 172. She said that, eventually, Donald Carter came back to her home with the gun. Id. at 173. Howze then described how Hart and the petitioner had gone to her bathroom when they arrived back at her home, and that she overheard a conversation where the petitioner mentioned that Hart saved his life. Id. 173-74.

Howze testified that on the day after the homicide, the petitioner gave her a demonstration of the events in the liquor store. Id.[1] at 176. Howze said that the petitioner told her that when the petitioner had approached the store counter, Myles had pulled a gun and pointed it at the petitioner's back. Id. at 194. Howze testified that the petitioner reported "scuffling on the floor of the liquor store[,]" and that "he let go" when he heard a gunshot. Id.

The last witness for the state, Donald Carter, said that while at the Howze household on the afternoon of May 27, 1976, the petitioner had asked him to go get a gun that the petitioner had dropped in the bushes. Id. at 203.

_____

[1] Howze's full rendition of the story is in the trial transcript at pages 193-94.

Carter said that he found the gun, loaded, between some bushes on his second attempt to find it. Id. at 204, 207. He testified that he recognized the gun that he found in the bushes as being the same one he saw at Elnora Howze's home several days before May 27, 1976. Id. at 206.

Although he filed a notice of alibi, id. at 22, the defendant did not testify and presented no evidence, id. at 225. After about three hours of deliberation, the jury found the petitioner guilty of attempted armed robbery as party to a crime and murder in the first degree as party to a crime. Id. at 267-68. The state court judge sentenced the petitioner to a term of life imprisonment for the first-degree murder conviction, and a term of five years for the attempted robbery, to run consecutively to the life imprisonment term. Dkt. No. 19-1.

2. <em>Petitioner's October 26, 1978 Direct Appeal</em>

The petitioner's *habeas* petition states that he filed a direct appeal on October 26, 1978. Dkt. No. 1 at 3. No documentation supports an October 26, 1978 filing date, but both parties provided the court with a Wisconsin Court of Appeals' decision dated March 29, 1979. Dkt. Nos. 5 at 81; 19-4. From this decision, the court gleans the following: on direct appeal, the petitioner argued that there was insufficient evidence to sustain the verdict and that the trial court erred in refusing to instruct the jury on the lesser included offense of second-degree murder. Id. at 82. After reviewing the evidence, the Wisconsin Court of Appeals affirmed the conviction, id. at 89, and on May 10, 1979, the Wisconsin Supreme Court denied the petitioner's direct appeal. Id. at 109.

Eight years later, on June 8, 1987, the petitioner filed a post-conviction

motion in the trial court under Wis. Stat. §974.06. Id. at 113. Neither party

provided the court with the trial court's decision, but both provided the

Wisconsin Court of Appeals' June 28, 1988 opinion on appeal. Dkt. Nos. 5 at

113; 19-5. The court of appeals' decision indicates that the petitioner raised

seven grounds for relief: (1) that there was insufficient evidence to convict him

of first-degree murder; (2) that his conviction for first-degree murder rather

than third-degree felony murder violated his right to due process; (3) that the

trial court violated due process in instructing the jury; (4) that the State denied

the petitioner a fair trial when the prosecution did not fully disclose the plea

agreement it offered to one of the witnesses against him; (5) that Wis. Stat.

§939.05 was unconstitutional on its face and as applied; (6) that prejudicial

remarks in the prosecutor's opening and closing statements denied him a fair

trial; and (7) that his trial and appellate counsel provided ineffective assistance.

Dkt. No. 19-5 at 2.

On the petitioner's ineffective assistance of counsel claim, the court of

appeals noted: (1) that the petitioner argued that his trial counsel should have

called Mark Springfield to testify on the petitioner's behalf; and (2) that the

petitioner had submitted an affidavit from Springfield dated September 19,

1986, attesting that Springfield had fabricated an earlier statement to police

that had inculpated Harris. Id. at 5-6. The court of appeals observed that, at

the time of trial, the petitioner's attorney would only have had Springfield's

original statement to police—the statement inculpating the petitioner. Id. The court reasoned that the petitioner's attorney would not have acted in the petitioner's interest by calling Springfield to testify about his statement inculpating the petitioner. Id. The court of appeals discussed and denied the petitioner's other grounds for relief, affirming the circuit court. Id. at 6.

4.    *Petitioner's October 11, 1994 Motion for Modification of Sentence*

The respondent submitted a decision from the Wisconsin Court of Appeals dated October 11, 1994. Dkt. No. 19-6. The decision states that in December of 1993, the petitioner filed a motion for modification of his sentence in the circuit court, arguing that "new factors" warranted modifying his sentence. Id. at 3.[2]

First, the petitioner presented his "his recent recollection that one of the investigating police officers told [the petitioner] he knew [the petitioner] did not pull the trigger. . . ." Id. at 4. In response, the court of appeals explained that the petitioner had been convicted of "first degree murder, *party to the crime*, under §939.05 STATS." Id. (emphasis in original). Under the party-to-a-crime theory, the court explained, "[w]hether [the petitioner] pulled the trigger or not, he is legally responsible for the murder as a party to the crime[.]" Id.

---

[2] In its decision, the court of appeals speaks of a second motion to modify the petitioner's sentence. This motion concerns a separate conviction. In August 1977, the petitioner was convicted in state court of four offenses, all as party to a crime: armed robbery, second-degree sexual assault and two counts of kidnapping. Dkt. No. 19-6 at 2.

The petitioner also claimed that his co-defendants' sentences constituted a factor that should have been considered at his sentencing. Id. at 5. The court of appeals responded that it would not consider Charles Hart's sentence as a factor because the petitioner had not supplied a record of the length or timing of Hart's sentence. Id. As to Herbert Shropshire, the court of appeals said that because Shropshire had been convicted only of attempted armed robbery (as a result of his plea agreement) instead of first-degree murder, it would not consider Shropshire's sentence as a factor. Id. at 5-6. The court of appeals denied the motion, id. at 7, and the Wisconsin Supreme Court denied the petition for review on February 21, 1995, dkt. no. 5 at 119.

### 5. *Petitioner's March 7, 2000 Wis. Stat. § 782.01 habeas petition*

On March 7, 2000, the petitioner filed a petition for *habeas corpus* in the circuit court under Wis. Stat. §782.01(1). See Dkt. Nos. 5 at 120; 19-7. The petitioner submitted a letter decision from the circuit court dated March 14, 2000, and the respondent submitted the Wisconsin Court of Appeals' decision dated June 7, 2001. Id. [3] Both the circuit court's letter decision and the court of appeals' decision held that the petitioner could not pursue §782.01 relief because he was in custody under a valid judgment of conviction entered by the circuit court in Milwaukee court in 1978. Id.

---

[3] The petitioner provided a decision from the court of appeals dated May 24, 2000, in which that court stated that it could not review the circuit judge's March 14, 2000 decision because it was not a "final order or judgment." Dkt. No. 5 at 122-23.

A little over four months later, on July 27, 2000, the petitioner filed a motion in Milwaukee County Circuit Court under Wis. Stat. §974.06. Dkt. No. 19-8 at 3. The respondent provided both the circuit court's August 10, 2000 decision, id., and the Wisconsin Court of Appeals' December 26, 2001 decision on the motion, id. at 1.[4] The circuit court's decision remarked that the petitioner brought a "grab bag" of motions, id. at 3, and after recounting the history of the case, analyzed the petitioner's arguments for ineffective assistance of trial and appellate counsel under §974.06, id. at 3-6. The circuit court observed that although the petitioner's §974.06 motion argued that his trial counsel failed to properly investigate his case, the petitioner could have raised that argument in his original, 1987 motion or on his appeal. Id. at 5-6 (citing State v. Escalona-Naranjo, 185 Wis.2d 169, 179 (1994)). As for the petitioner's argument that his post-conviction counsel, Mark Lukoff, failed to raise various ineffective assistance of counsel issues, the circuit court found that the petitioner had raised these issues himself and that Escalona barred him from proceeding. Id. at 6.

The Wisconsin Court of Appeals summarily affirmed the circuit's court denial of the petitioner's post-conviction motion. Id. at 2. The court concluded that "[the petitioner] is foreclosed from relitigating issues, and that his multiple ineffective assistance claims do not constitute a sufficient reason to belatedly

---

[4] The petitioner provided only the last page of the circuit court's decision. Dkt. No. 5 at 101.

raise issues he could have raised in his previous *pro se* postconviction motion." Id.

### 7. *Petitioner's January 6, 2015 Knight Petition*

Fourteen years later, in January of 2015, the petitioner filed in the Wisconsin Court of Appeals a *pro se* petition for a writ of *habeas corpus* under State v. Knight, 168 Wis. 2d 509, 522 (1992). Dkt. Nos. 5 at 90, 92; 19-9; see also Dkt. No. 19-11 at 2 (public records indicating the petitioner filed his petition on January 6, 2015). In an April 13, 2015 decision, the court of appeals found that the petitioner's claims of (a) ineffective assistance of trial counsel; (b) sentencing based on inaccurate information; and (c) newly discovered evidence warranting a new trial all should be presented to the trial court in a Wis. Stat. §974.06 motion. Dkt. No. 19-9 at 3-4. As for the petitioner's argument regarding ineffective assistance of appellate counsel, the court of appeals remarked that the petitioner's allegations centered on his belief that his appellate counsel should have investigated, conducted witness interviews and aided the petitioner in his pursuit of a new trial on grounds of newly discovered evidence. Id. at 4. Because the Knight petition challenged the conduct of his *post-conviction* counsel rather than the conduct of *direct appellate* counsel, the court again opined that a §974.06 motion was the appropriate mechanism for the petitioner to raise his claims. Id. at 5. The court dismissed the petition.

8.     *Petitioner's April 22, 2015 § 974.06 Motion*

On April 22, 2015—nine days after the court of appeals' decision—the petitioner filed in the circuit court a *pro se*, post-conviction motion under Wis. Stat. §974.06, seeking a new trial based on new evidence. Dkt. No. 5 at 97. The petitioner provided both the circuit court's May 5, 2015 decision denying his motion, dkt. no. 5 at 97-100, and the Wisconsin Court of Appeals' February 9, 2016 decision, id. at 102-107. The respondent provided the court of appeals' decision. Dkt. No. 19-12.

The trial court observed that the petitioner "ha[d] appended statements from co-defendants Shropshire and Hart, plus affidavits from Pullum, and Springfield, which he claims demonstrate unequivocally that he had no knowledge of Shropshire and Hart's intent to rob the liquor store." Dkt. No. 5 at 97. It then found that "[t]he uncorroborated statements from the co-defendants are insufficient to grant the relief requested." Id. The trial judge detailed his concerns with the hearsay nature of the "new evidence," and described how "the testimony of other witnesses at trial flies in the face of defendant's current contentions and attached affidavits." Id. at 99. Specifically, he observed that both Howze and Carter had testified about the petitioner asking them to retrieve a gun from some bushes. Id. at 99-100.

The court of appeals first considered an affidavit dated October 3, 2014 from the petitioner's co-defendant, Charles Hart. Dkt. No. 19-12 at 5. The Hart affidavit indicated that Hart and Shropshire "decided to steal a money bag from behind the store counter without Harris knowing about it[,]" and that the

12

petitioner "had no knowledge that [Shropshire] and I had formed the intent to steal money from the . . . [s]tore." Id. The court found this affidavit unpersuasive, because "[the petitioner] previously filed two statements from Hart in support of [the petitioner]'s prior postconviction motions: a signed statement dated 1986 and a notarized affidavit dated December 4, 1991." Id. at 6. The court explained that "in Hart's 1991 affidavit, he not only asserted that [the petitioner] was not involved, but also that [the petitioner] was not even in the store at the time of the crimes, having been left by Hart and Shropshire 'at a filling station on 17th Street.'" Id.[5] The court of appeals held that "[the petitioner] cannot relitigate this issue by submitting another affidavit from Hart again asserting that [the petitioner] was not involved in the crimes." Id.

The court then addressed an affidavit from Mark Springfield, dated in 2008. Id. at 7. In it, Springfield stated that he never heard the petitioner discussing a proposed robbery, and that Springfield had learned later in life that the petitioner did not have anything to do with the storeowner's death. Id. The appellate court noted that the petitioner had submitted a 1986 affidavit from Springfield (containing similar attestations) in connection with his 1987 §974.06 motion. Id. The court found that the petitioner could not relitigate the issue by submitting a new affidavit from Springfield. Id.

Third, the court of appeals considered an April 20, 2009 affidavit from "Raymond Pullum," who claimed to have served prison time with Charles Hart.

---

[5] The respondent submitted an affidavit from Charles Hart dated December 4, 1991. See Dkt. No. 19-14.

Id. The appellate court recounted how Pullum's affidavit stated that Hart had told Pullum that the petitioner did not have anything to do with the homicide of the storeowner. Id. The court concluded that "[a]t best, [Pullum's affidavit] could be used to bolster Hart's numerous statements that [the petitioner] was not involved, but evidence that is 'merely cumulative' does not provide a basis for a new trial." Id. at 7-8.

Finally, the court of appeals described "a two-page, unsigned document entitled 'INVESTIGATION MEMO' that purports to be a memo to 'File' from Byron Lichstein of the University of Wisconsin Law School's Remington Center." Id. at 8. As described by the court of appeals, the memo recounted a conversation between Lichstein—an attorney with the Wisconsin Innocence Project—and Herbert Shropshire, in which Shropshire told Lichstein: (a) that Shropshire, Hart and Harris all entered the store to buy liquor; (b) that they previously had not discussed committing a robbery; (c) that upon entering the store, Shropshire and Hart decided to commit a robbery; (d) that Hart pulled out the gun, which caused the storeowner/victim to grab the petitioner by the neck; and (e) that Hart shot the storeowner in the head. Id.

After assuming—without deciding—that the memo was authentic and accurate, the court found that the document did not provide a basis for a new trial. Id. It noted that Shropshire's statement in the memo would be a recantation of his trial testimony, and that the memo contradicted "both the testimony offered at trial by other witnesses and by the affidavits [the petitioner] has offered in support of his postconviction motions." Id. at 8-9. The

court cited the inconsistency between the Shropshire memo (which stated that Hart had a gun) and Hart's 2014 affidavit (which stated that that none of the three men entered the store with a gun and that the victim was killed with his own gun). Id. The court dismissed the petitioner's arguments about his trial and appellate counsel because he had raised them—unsuccessfully—in prior litigation. Id. at 10. On May 5, 2016, the Wisconsin Supreme Court denied the petitioner's petition for review. Dkt. No. 5 at 125.

B.    Federal Court Proceedings

1.    *Petitioner's August 29, 2002 petition for habeas corpus*

This is the not the first time that the petitioner has pursued *habeas* relief in federal court. The petitioner provided the court with a March 26, 2003 decision from Judge J.P. Stadtmueller in case number 02-C-851. Dkt. No. 5 at 110. In his March 26, 2003 order, Judge Stadtmueller recounted that on August 29, 2002, the petitioner had filed a petition for a writ of *habeas corpus* under 28 U.S.C. §2254, but that the petition did not comply with Rule 2(c) of the Rules Governing Section 2254 Cases because the petitioner failed to provide copies of the state court decisions concerning his direct appeal and post-conviction proceedings. Id. Judge Stadtmueller's decision explained that he had directed the petitioner to file an amended petition, but that while the petitioner did so, he still had not attached the documents, claiming "the necessary state court decisions 'came up missing' from his property during the many riots and lockdowns which took place over the years at his place of incarceration." Id. Judge Stadtmueller determined that he could not conduct a

15

preliminary, Rule 4 review of the petition without these decisions, and dismissed the petition without prejudice. Id. at 111.

   *2. Petitioner's request in the Seventh Circuit Court of Appeals*

  Before filing this petition, the petitioner applied to the Seventh Circuit Court of Appeals for an order allowing him to proceed in the district court under 28 U.S.C. §2244(b)(3). Dkt. No. 5 at 129. The petitioner submitted a May 1, 2017 decision, in which the Seventh Circuit determined that the petitioner's application to bring a "second" or successive petition under 28 U.S.C. §2244(b)(3) was unnecessary. Id. Judge Posner explained that "[a] prior decision dismissing a collateral attack without prejudice does not subject a later collateral attack to the pre-approval requirement of § 2244(b)." Id. at 129-30 (citing Pavlovsky v. VanNatta, 431 F.3d 1063 (7th Cir. 2005)). Thus, the Seventh Circuit held, "[the petitioner] may file his petition directly in the district court." Id. at 130.

   *3. Petitioner's Current Petition*

  On May 11, 2017—ten days after the Seventh Circuit's decision—the petitioner filed the current petition for writ of *habeas corpus* under 28 U.S.C. §2254, along with a request for an evidentiary hearing. Dkt. Nos. 1, 4. The next day, the petitioner filed a brief in support his petition, together with 130 pages of attachments. Dkt. No. 5.

  On May 25, 2017, Judge Duffin screened the  petition, and ordered the respondent to answer or file a motion to dismiss within sixty days of the day of the screening order. Dkt. No. 10. Six days after Judge Duffin's order, the

petitioner filed a motion, asking the court to appoint counsel to aid him in pursuing *habeas* relief. Dkt. No. 11. When the respondent refused consent to proceed before Judge Duffin, dkt. no. 16, the clerk's office transferred the case to this court.

On July 21, 2017—several days before the respondent's deadline to answer the *habeas* petition—the respondent filed a motion for an extension of time to answer or otherwise respond. Dkt. No. 17. The motion asked for a four-day extension—from July 24, 2017 until July 28, 2017. Id. This court did not rule on the motion for an extension of time, and the respondent filed a motion to dismiss together with supporting documentation on July 28, 2017. Dkt. Nos. 18, 19. Within a week, the court received from the petitioner a "motion for default judgment," asking the court to grant default judgment in his favor due to the respondent' failure to respond within sixty days. Dkt. No. 20. That same day, the petitioner filed his brief in opposition to the respondent's motion to dismiss. Dkt. No. 22. Three weeks later, the respondent wrote a letter to the clerk of court, stating that she would not be filing a reply brief to support her motion to dismiss. Dkt. No. 25.

## II. Discussion

### A. Respondent's Motion for Extension of Time (Dkt. No. 17)

Before getting to the substance of the petition, the court must address its failure to timely rule on the respondent's motion for an extension of time, and the consequences of that failure.

17

Judge Duffin ordered the respondent to either answer the petition or file a motion to dismiss it within sixty days of the date of his Rule 4 screening order. Dkt. No. 10. He issued that order on May 25, 2017, so the sixty-day deadline was Monday, July 24, 2017. The respondent filed her motion to extend that deadline on July 21, 2017—several days before the deadline expired. The motion asked for a brief and reasonable extension—only four days.

This court should have promptly ruled on the respondent's motion. The court did not do so, and it has no excuse other than to say that the motion fell through the cracks of the court's case tracking system. Had it seen the motion, however, it would have granted it. Under Federal Rule of Civil Procedure 6(b)(1)(A)—applicable to *habeas* proceedings under Rule 12 of the Rules Governing Section 2254 Cases—the court may, for good cause, extend the time for a party to act. The respondent's motion listed a number of cases that had needed counsel's attention during the sixty-day period, and asked for a short, reasonable extension of only four days. Although the court did not timely rule on the motion, the respondent filed the motion to dismiss exactly when she said she would—on July 28, 2017.

The court finds that the respondent showed good cause and will grant the respondent's July 21, 2017 motion for an extension of time, *nunc pro tunc* to July 28, 2017.

B.	Petitioner's Motion for Default Judgment (Dkt. No. 20)

The consequence of this court's failure to rule promptly on the respondent's motion for an extension of time is that the petitioner filed a motion under Federal Rule of Civil Procedure 55, asking the court to grant default judgment in his favor. Dkt. No. 20. Rule 55 is applicable in *habeas* cases under Rule 12 of the Rules Governing Section 2254 Cases. Rule 55 says that if a party "against whom a judgment for affirmative relief is sought has *failed to plead or otherwise defend*, and that failure is shown by affidavit or otherwise," the clerk must enter default.

The petitioner's motion argues that because the respondent did not file the motion to dismiss by the deadline Judge Duffin had set, the court should grant judgment in his favor. But as the court explained above, the respondent did not "fail to plead or otherwise defend." She timely filed a motion to extend Judge Duffin's deadline by four days, and she filed a motion to dismiss (which is an acceptable defense to the petition). Rule 55 applies when a defendant or respondent sits on her hands and provides no defense to a claim. That is not what happened here, and default judgment is not warranted. The court will deny the petitioner's motion.[6]

C.	Respondent's Motion to Dismiss

Because the court has held that the respondent's motion to dismiss was timely, it will turn to the substance of that motion.

---

[6] The petitioner also mentions Fed. R. Civ. P. 58 in his motion for default judgment. That rule is inapplicable. It governs the court's practices in how to enter judgments, not how a defendant or respondent must reply.

The respondent asserts that the petitioner did not file this current petition within the one-year statute of limitations period mandated by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Dkt. No. 18 at 1. That statute—28 U.S.C. §2244(d)(1)—provides:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. §2244(d)(1).

The one-year limitations period is subject to two different "tolling" procedures—statutory tolling and equitable tolling. Subsection (d)(2) of the statute provides for "statutory tolling," stating that "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. §2244(d)(2). As for equitable tolling, a court may invoke that doctrine only if the petitioner

shows "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland v. Florida, 560 U.S. 631, 649 (2010). "Equitable tolling is an extraordinary remedy and so 'is rarely granted.'" Obriecht v. Foster, 727 F.3d 744, 748 (7th Cir. 2013) (quoting Simms v. Acevedo, 595 F.3d 774, 781 (7th Cir. 2010)). "The petitioner seeking equitable tolling bears the burden of establishing that it is warranted." Id. (citing Williams v. Buss, 538 F.3d 683, 685 (7th Cir. 2008)).

1. *Parties' Arguments*

a. Respondent

The petitioner's conviction pre-dates the ADEPA by about eighteen years. Because the law was not in effect at the time the petitioner's conviction became final, the respondent first contends that the petitioner should have filed his petition within one year of the effective date of AEDPA—which was in 1996. Dkt. No. 19 at 7. The respondent points out that the petitioner filed his petition in 2017—more than twenty-one years after the effective date of AEDPA. Dkt. No. 19 at 6. She also argues that the record of state court proceedings shows that the petitioner took no action on his case between the Wisconsin Supreme Court's February 21, 1995 denial of his petition to review his motions for sentence modification and his July 27, 2000 filing of a §974.06 motion in Milwaukee Circuit Court. Id. The respondent argues that, because the petitioner did not file a motion that qualified for statutory tolling, the "the last day on which [the petitioner]'s petition could have been timely under

§2244(d)(1)(A) was April 24, 1997—one year after the AEDPA's effective date." Id. at 7-8.

Recognizing that §2244(d)(1) says that the one-year period runs "from the latest of" the four possible trigger dates, the respondent also argues that the petition is untimely under §2244(d)(1)(D). That section of the statute says that the petition is timely if the petitioner filed it within one year of "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence."

As noted in the facts, the petition lists four categories of "newly discovered evidence" that he says support the granting of the petition: Shropshire's recantation to Attorney Byron Lichstein, Charles Hart's affidavit, the statement of Mark Springfield, and the "new theory" that his trial and appellate lawyers did not investigate several issues. Dkt. No. 1 at 6-10. The respondent addresses each of these categories.

As for Herbert Shropshire's statement to Attorney Lichstein, the respondent notes that the memo memorializing the conversation between Lichstein and Shropshire is dated May 9, 2013. The petitioner, however, did not raise a claim based on the memo until January 6, 2015, when he raised it in his Knight petition to the Wisconsin Court of Appeals. Dkt. No. 19 at 8-9. The respondent, assuming that Attorney Lichstein contacted the petitioner about the memo shortly after its compilation, argues that "[t]he period in which [the petitioner] could have raised a claim in federal court based on Shropshire's recantation expired in May 2014[.]" Id. at 9.

22

As for the "Newly Discovered Evidence of Charles Hart," the respondent points to the Wisconsin Court of Appeals' explanation that the petitioner had offered Hart affidavits from 1986 and 1991 in support of the petitioner's previous state court requests for relief. Id. at 9-10. After reviewing the contents of Hart's 2014 affidavit, the respondent indicates that "[t]he substance of Hart's 2014 affidavit—that [the petitioner] was not involved in the plan to rob the liquor store—was known to [the petitioner] in 1986." Id. (citing Dkt. No. 19-6). Thus, the respondent contends, Hart's most recent affidavit cannot be considered newly discovered evidence for purposes of §2244(d)(1)(D).

With regard to the "Newly Discovered Evidence of Mark Springfield," the respondent makes the same arguments she made regarding Hart's 2014 affidavit. Dkt. No. 19 at 10-11. The respondent says that neither Mark Springfield's 2008 affidavit nor Raymond Pullum's 2009 affidavit "appear to have been presented to the state courts until January 2015 when [the petitioner] filed his *Knight* petition." Id. at 11. Because both of these affidavits date back almost a decade, and because the Wisconsin Court of Appeals discussed how the contents of Springfield's 2008 affidavit tracked a 1986 affidavit from Springfield submitted in support of the petitioner's first Wis. Stat. §974.06 motion, the respondent says that the court should find the claims in ground three to be untimely under §2244(d)(1)(D).

As for the petitioner's final ground, ineffective assistance of counsel, the respondent says that

> [the petitioner]'s claims of ineffective assistance for failure to investigate are untimely. To the extent that these claims rest

upon purportedly newly discovered statements, they are untimely under §2244(d)(1)(D) because, as discussed, [the petitioner] failed to file these claims (direct error and ineffective assistance) within one year of his discovery of the statements. And, as noted, any claims not based on newly discovered evidence were untimely as of April 1997.

Id. at 12.

> b.   Petitioner

The petitioner does not address the issue of timeliness until page twenty-one of his response brief. Dkt. No. 22 at 21. He spends the majority of his brief arguing the merits of his petition and his actual innocence. As to timeliness, the petitioner makes several arguments: (1) that he could not have obtained the Shropshire memo as of the effective date of AEPDA (April 24, 1996); (2) that the Wisconsin Innocence project investigation continued until the petitioner filed his §974.06 motion; (3) that the Wisconsin Innocence project attorneys "spent[] years trying to locate everyone who testified at [the petitioner]'s jury trial in May, 1978," but were successful in only finding Charles Hart and Herbert Shropshire; and (4) that "[b]ased on the investigation [the petitioner] wasn't able to file his petition as alleged by the respondent on page 1-9 of their motion to dismiss." Id.

The petitioner says that he diligently filed his Wis. Stat. §974.06 motion once the Wisconsin Innocence Project investigation closed. Id. In an affidavit submitted with his response brief, the petitioner asserts:

> The Innocent Project's Lawyers's Investigation stood in my way of filing the innocent claim within the one year of discovering the recantation of Herbert Shropshire. The lawyers were trying to locate Ellnora Howze, Mark Springfield, Trudey Joiner, Charles Hart, Herbert Shropshire; and when they had

24

interviewed Herbert Shropshire in May of 2013, they were still trying to locate Charles Hart, Ellnora Howze, Mark Springfield, Trudey Joiner and Donald Carter, diligently[.]

Dkt. No. 23 at 2-3. The petitioner does not say when he received or first became aware of the May 9, 2013 Lichstein memo.

The petitioner argues that if the court concludes that his petition was untimely, it should nonetheless grant his petition on the ground of actual innocence. He puts it this way:

Actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar or expiration of the Statute of Limitations for a habeas corpus petition such pleas are rare and the petitioner must persuade the District Court that, in light of the new evidence, no jury acting reasonable [sic] would have voted to find him guilty beyond a reasonable doubt. The U.S. Supreme Court decided <u>Mcquiggin v. Perkins</u>, U.S. 133 S.Ct. 1124, . . . in which the court held that in extremely rare circumstances, an actual innocence claim can over-come 28 U.S.C. 2244(d)(1)5 one year statute of limitation.

Dkt. No. 22 at 22.

Finally, the petitioner argues for equitable tolling, citing <u>Holland</u>, 560 U.S. 631. <u>Id.</u> After accurately describing the two factors a court must consider in determining whether equitable tolling applies, the petitioner says that he "could never get the State's Witness to tell the truth until the Innocent Project Lawyers did the investigation[.]" <u>Id.</u> The petitioner describes his case as extraordinary, and again contends that he filed his §974.06 petition as soon as the Wisconsin Innocence project lawyers closed his case.

2.	*Analysis.*

a.	Timeliness

Section 2244 provides four possible "trigger dates" for starting the one-year statute of limitations. Under 28 U.S.C. §2244(d)(1)(A), a petition is timely if filed within a year after the judgment becomes final. In cases like the petitioner's, however, where the conviction became final before the effective date of the AEDPA, the Seventh Circuit has held that a petition is final if the petitioner filed it within a year after the AEDPA's April 24, 1996 effective date. Lozano v. Frank, 424 F.3d 554, 555 (7th Cir. 2005). The petition here is over twenty years late by this measure, and the petitioner does not argue otherwise.

The petitioner does not argue that some State action prevented him from filing this *habeas* petition, so he cannot rely on 28 U.S.C. §2244(d)(1)(B) to argue that the petition is timely. He does not claim that he is asserting a right newly recognized by the Supreme Court, so he cannot argue that the petition is timely under 28 U.S.C. §2244(d)(1)(C).

The only section of 28 U.S.C. §2244(d)(1) which could possibly render a petition filed thirty-nine years after conviction is subsection (d)(1)(D). Under that subsection, a petition is timely if it is filed within one year from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. §2244(d)(1)(D).

When looking at whether claims in a *habeas* petition are timely under §2244(d)(1)(D), courts separately consider the timeliness of each claim in the

petition. <u>Davis v. United States</u>, 817 F.3d 319, 327-28 (7th Cir. 2016) ("[A]s

every other circuit to have considered the question has concluded, and we now

hold, the timeliness of each claim asserted in either a section 2255 motion or a

petition challenging a state-court conviction under 28 U.S.C. §2254 must be

considered independently."). In making this determination, the Seventh Circuit

reasoned:

> [t]he simple fact that [the petitioner] might have one timely claim to make under section 2255 based on a Supreme Court precedent issued years after his conviction otherwise became final does not allow him to tack on additional, otherwise untimely claims to that one timely claim. [The petitioner] asserts that all his claims are intertwined, but that is true only in the sense that they all generally relate to his sentence, and that is not enough to deem them all timely.

<u>Id.</u> This reasoning applies with equal force to the court's timeliness analysis

here; the petitioner's "new evidence" supporting one claim would not allow him

to "bootstrap" otherwise untimely claims into consideration. The court will

consider each of the petitioner's "newly discovered" pieces of evidence

independently.

### i. Ground One: "Newly Discovered Evidence of Herbert Shropshire"

The petitioner asserted that he had "newly discovered evidence" from

Herbert Shropshire. Dkt. No. 1 at 6-7. He points to the "INVESTIGATION

MEMO" bearing the name Byron Lichstein of the Wisconsin Innocence Project

dated May 9, 2013. Dkt. No. 5 at 60. To verify the memo's authenticity, the

petitioner presents the court with: (1) a cover letter from the Wisconsin

Innocence Project dated March 11, 2016, dkt. no. 5 at 127; (2) a record of an e-

mail conversation between attorneys at the Wisconsin Innocence Project, id. at

128; and (3) an affidavit from Herbert Shropshire dated February 20, 2016, id.

at 108. He also provided the court with a scan of an envelope bearing the

University of Wisconsin Law School's return address information and Byron

Lichstein's name, addressed to the petitioner, bearing the typed words "LEGAL

CORRESPONDENCE," and post-marked September 16, 2014. Id. at 59.[7]

None of these documents provides evidence of when the petitioner

*became aware* of Attorney Lichstein's May 9, 2013 interview with Shropshire,

in which Shropshire allegedly recanted his trial testimony. Lichstein's memo is

dated May 9, 2013. The letter the plaintiff provided from Professor Adam

Stevenson at the Innocence Project, and the email exchange between Professor

Stevenson and Lichstein, confirms that Lichstein prepared such a memo. The

scanned envelope appears to indicate that Lichstein put something—the court

does not know what—in the mail to the petitioner on September 16, 2014.

The respondent assumes that the petitioner became aware of the

Shropshire interview in May 2013, and argues that the time for him to raise a

claim in federal court based on that memo expired in May 2014. Dkt. No. 19 at

8-9. The court has no idea whether the petitioner became aware of the

Shropshire interview in May 2013. The respondent also argues that the

---

[7] Shropshire's February 20, 2016 affidavit contains no novel allegations
compared to the May 9, 2013 memo, and the first sentence of the 2016
affidavit refers to Shropshire's 2013 statements. For purposes of the court's
analysis, the 2016 affidavit is not relevant to "the date on which the factual
predicate of the claim . . . could have been discovered through the exercise of
due diligence." 28 U.S.C. §2244(d)(1)(D).

petitioner did not bring a claim based on the Shropshire interview until January 6, 2015, when he filed his <u>Knight</u> petition in the state court of appeals. <u>Id.</u>; <u>see also</u> Dkt. No. 19-9 at 4. The court does not know whether the petitioner referred to the Shropshire interview in the <u>Knight</u> petition—the court of appeals stated only that the petitioner had asserted that he had new "witness statements and proof of perjury." Dkt. No. 19-9 at 4. He does appear to have known about the Shropshire interview by April 22, 2015, when he filed his §974.06 motion. Dkt. No. 19-12 at 3. The court of appeals discussed it in the decision affirming the denial of that motion. <u>Id.</u> at 8-9.

Regardless of whether the petitioner learned about Shropshire's recantation in May 2013, or September 2014 or April 2015, he did not file this *habeas* petition within one year of any of those dates. There is one other factor for the court to consider, however. That is the doctrine of statutory tolling under §2244(d)(2).

Section 2244(d)(2) states that "the time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent . . . claim is pending shall not be counted toward any period of limitation under this subsection." It is certain that the petitioner knew about Shropshire's recantation as of the date he filed his §974.06 motion—April 22, 2015. The court will assume that the §974.06 motion was "properly filed," because the circuit court ruled on it. <u>Freeman v. Page</u>, 208 F.3d 572, 576 (7th Cir. 2000) The motion was pending before the circuit judge from April 22 through May 5, 2015, and the petitioner filed a timely notice of appeal on May

14, 2015. The court of appeals affirmed the circuit court's ruling on February 9, 2016; the Wisconsin Supreme Court denied the petition for review on May 10, 2016. So—this properly-filed post-conviction motion was pending from April 22, 2015 through May 10, 2016, or one year and eighteen days.

Given the evidence that the petitioner knew about Shropshire's recantation on April 22, 2015 at the very latest, he filed his federal petition two years and twenty-five days later. But he had a properly-filed post-conviction motion pending for one year and eighteen days of that time. The court does not count those days against the one-year AEDPA clock. That means that the one-year clock did not start "running" until the Wisconsin Supreme Court denied the petition for review on May 10, 2016.

Even under this calculation, the petitioner filed his federal petition too late. One year from May 10, 2016 would have been May 10, 2017. The petitioner filed his federal *habeas* petition on May 11, 2017—the day after the one-year period had expired.

Under any calculation that the court can conduct—even one likely more favorable to the petitioner than reality warrants—he filed his petition more than one year after he discovered the Shropshire recantation, and his petition is untimely on that claim.

ii.      **Ground Two: "Newly Discovered Evidence of Charles Hart"**

The petitioner titled his second claim for relief as "Newly Discovered Evidence of Charles Hart." Dkt. No. 1 at 7. In support, the petitioner submitted an affidavit from Charles Hart dated October 3, 2014. Dkt. No. 5 at 62-64. The

summary of Hart's 2014 affidavit is that Herbert Shropshire lied at trial and that the petitioner did not shoot Mr. Myles. <u>Id.</u> Again, the court does not know when the petitioner found out about Hart's October 2014 affidavit. He asserts repeatedly that he filed his post-conviction motion as soon as the Innocence Project lawyers closed their investigation, but never says when they did so. He never says when he learned about Hart's statement. It is reasonable to assume that the petitioner learned about the affidavit around the time Hart made it; if that is the case, he filed his May 11, 2017 over two and a half years later. Even subtracting the year and eighteen days that the §974.06 motion was pending, the petitioner was more than a year late in filing this claim in federal court.

The claim is likely far more delinquent than that, however. In its February 9, 2016 order affirming the trial court's denial of the §974.06 motion, the court of appeals pointed out that in connection with prior post-conviction motions, the petitioner had submitted a statement Hart signed in 1986 and a notarized affidavit from Hart dated 1991, both of which claimed that the petitioner was not involved in the robbery. Dkt. No. 19-12 at 6. The respondent provided the court with the affidavit; it is dated December 4, 1991. Dkt. No. 19-14. The summary of that affidavit is that Herbert Shropshire lied at trial and that the petitioner was not a part of the attempted robbery and the homicide of Gervis Myles. <u>Id.</u> The evidence demonstrates that the petitioner discovered the "factual predicate" of Hart's 2014 affidavit well before October 3, 2014—perhaps as long as twenty-eight *years* before October 2014.

The petitioner's "newly discovered evidence" claim as to Hart is not timely.

### iii.   Ground Three: "Newly Discovered Evidence of Mark Springfield"

The petitioner's third ground for relief also is untimely. The petitioner submitted an affidavit from Mark Springfield dated 2008, and an affidavit from a man named Raymond Pullum dated April 30, 2009. Dkt. No. 5 at 66. The petitioner appears to have had these short, one-page assertions that the petitioner is not guilty in his possession since 2008 (for Springfield) and 2009 (for Pullum). He did not file his federal petition until nine and eight years later, respectively. He *did* mention these affidavits in his April 22, 2015 §974.06 motion, but again, even if the court subtracts the one year and eighteen days that that motion was pending, the petitioner's federal claims based on these affidavits are years beyond the expiration of the limitations period.

The petitioner's third "newly discovered evidence" ground, based on the statements of Springfield and Pullum, is untimely.

### iv.   Ground Four: Ineffective Assistance of Counsel

In his fourth ground for relief, the petitioner alleges that his trial and appellate counsel provided ineffective assistance of counsel, because they failed to adequately investigate Herbert Shropshire, Charles Hart, Dinah Gray and Mark Springfield. Dkt. No. 1 at 10. He does not, however, indicate why he could not have brought this claim earlier. The petitioner knew as early as 1986 that Charles Hart had made a statement saying that he wasn't involved in the

robbery. He knew that Mark Springfield had stated that he wasn't guilty as early as 2008 (and possibly as early as 1986). He says that Dinah Gray would have disputed Elnora's Howze's testimony, but provides no information about when he learned that (and provides no information supporting that claim). These facts demonstrate that the petitioner could have brought an ineffective assistance of counsel claim in federal court anywhere from five to fifteen years after his conviction became final, but he did not do so.

Even the fact that the petitioner turned to the law school's Innocence Project shows that at some point before April 2013 (the date of the Lichstein memo about his interview with Shropshire), the petitioner must have believed that his trial and appellate counsel had not done all they could for him. The petitioner's conviction became final in May 1979—almost thirty-nine years ago—and he has beenchallenging that conviction ever since. The notion that he could not have brought an ineffective assistance claim against his trial and appellate lawyers in federal court until May 2017 has no merit.

The petitioner's "new theory" of ineffective assistance of counsel is untimely.

b.      Equitable Tolling

All of the petitioner's "newly discovered evidence" claims are untimely, even under §2244(d)(1)(D). Recognizing this, the petitioner invokes the doctrine of equitable tolling. Dkt. No. 22 at 22. The petitioner correctly lists the factors that a petitioner must demonstrate under Holland: "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances

33

stood in his way' and prevented timely filing." Holland, 560 U.S. at 649 (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)).

As noted above, courts rarely grant the remedy of equitable tolling. Obriecht, 727 F.3d at 748. The burden is on the petitioner to show that that he has been diligently pursuing his rights, and that the required extraordinary circumstances existed. Id. "'Extraordinary circumstances' are present only when an 'external obstacle' beyond the party's control 'stood in [its] way' and caused the delay." Lombardo v. United States, 860 F.3d 547, 552 (7th Cir. 2017) (quoting Menominee Indian Tribe of Wis. v. United States, —U.S.—, 136 S.Ct. 750, 756 (2016)).

The court need not spend time considering whether the petitioner has been "diligently pursuing his rights"—at the very least, he has been diligently filing things in state court for the better part of four decades. The petitioner has not met the second factor necessary for the court to grant the extraordinary remedy of equitable tolling. He has not demonstrated that an external factor beyond his control stood in his way and prevented him from timely filing a federal *habeas* petition.

The petitioner states that he "could never get the State's Witness to tell the truth until the Innocent Project Lawyers did the investigation." Dkt. No. 22 at 22. He then says that the Innocence Project investigation "stood in his way of filing his actual innocence claim," and that "it took place when the investigation was over." Id. He says that the Innocence Project lawyers were diligently trying to find the witnesses from the 1978 trial but "couldn't locate

them," and says that after the lawyers closed the investigation, he diligently filed his §974.06 motion. Id. Finally, he says that he was "building up his actual innocent claim to show his actual innocent and ineffective assistance of counsel of trial and appellate counsel claims." Id. at 23.

First, the evidence contradicts the petitioner's statement that he could never get certain witnesses to "tell the truth" before the Innocence Project took his case. He knew as early as 1986, and certainly in 1991, that Hart claimed the petitioner was innocent. He knew in 2008 that Springfield claimed he was innocent, and knew that Pullum said the same as of 2009. As of 2009, then— eight years before he filed his federal petition—the petitioner had three witnesses who said he was innocent.

Second, it appears that the petitioner wanted the Innocence Project to complete its investigation before he filed a petition. While that is understandable, it is not an "extraordinary circumstance" that "stood in the way" of the petitioner filing a federal petition. The only impediment to the petitioner filing a federal *habeas* case sooner was his own desire to present a strong case. That desire does not constitute an extraordinary circumstance, because it was entirely within the petitioner's control. Lombardo, 860 F.3d at 552 ("the circumstances that caused a party's delay must be 'both extraordinary *and* beyond its control.'") (citing Menominee Indian Tribe, 136 S.Ct. at 756) (emphasis in Lombardo).

Finally, the plaintiff intimates that the Innocence Project lawyers prevented him from filing anything until they finished their investigation. He

presented no evidence to support this, and as the court has noted, he had evidence available to him well before the Innocence Project became involved which he could have used to file a federal *habeas* petition.

The petitioner has not shown that "extraordinary circumstances" kept him from filing a *habeas* claim within the statutory limitations period. The court will not equitably toll the limitations period to find the petition timely.

c.    Actual Innocence

The previous analysis is a prelude to the petitioner's major argument: that the evidence the petitioner has submitted shows that he is "actually innocent." He appears to be arguing two things: (1) that his submissions show a "fundamental miscarriage of justice" that should act as a "gateway" to allow the court to consider the claims in his petition despite their untimeliness; and (2) that his submissions show his "actual innocence" and constitute an independent ground entitling him to a new trial.[8]

In McQuiggin v. Perkins, 569 U.S. 383, 392 (2013), the Supreme Court determined that a showing of actual innocence—previously part of a judicially-created "fundamental miscarriage of justice exception"—survived the passage of AEDPA, and in certain circumstances, would allow a petitioner to overcome AEDPA's one-year statute of limitations bar. McQuiggin, 569 U.S. at 392. To defeat the bar, a petitioner must make a "credible showing of actual innocence." Id. Such a showing "requires petitioner to support his allegations of

---

[8] Although the plaintiff did not list "actual innocence" as a specific ground for relief in the petition, the arguments in each of the "newly discovered evidence" grounds amount to arguments that the evidence shows his actual innocence.

constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995).

The Schlup standard allows a federal district court to conduct a *habeas* review of time-barred or defaulted claims only in the "extraordinary case" where the petitioner has demonstrated that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more than not any reasonable juror would have reasonable doubt." House v. Bell, 547 U.S. 518, 538 (2006). This is a "demanding standard[.]" Gladney v. Pollard, 799 F.3d 889, 899 (7th Cir. 2015); see also Hayes v. Battaglia, 403 F.3d 935, 938 (7th Cir. 2005) (noting that a petitioner "must have documentary, biological (DNA) or other powerful evidence: perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim."). The Supreme Court "ha[s] not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." McQuiggin, 569 U.S. at 392 (citing Herrera v. Collins, 506 U.S. 390, 404-05 (1993)).

The petitioner's submissions do not meet this demanding standard. The petitioner has presented five pieces of evidence to show that he is actually innocent: (1) the May 9, 2013 memo from Attorney Lichstein, containing notes of his interview with Herbert Shropshire; (2) the October 3, 2014 affidavit from

Charles Hart; (3) Mark Springfield's 2008 affidavit; (4) Raymond Pullum's 2009 affidavit; and (5) the petitioner's own affidavit dated October 3, 2014.

### i.    *Shropshire Investigation Memo*

The portion of Lichstein's memo detailing the Shropshire interview begins by discussing how Shropshire agreed to talk with the attorneys after one of the petitioner's brothers encountered Shropshire in their neighborhood. When the Innocence Project tried to make calls to Shropshire, the people who answered his phone "repeatedly said Shropshire either wasn't at home or wasn't willing to talk." Dkt. No. 5 at 60. The memo says Shropshire willingly talked to Attorney Lichstein through the efforts of the petitioner's niece, Revelle Williams. Id. At the outset, it appears that the petitioner's family may have pushed, or even intimidated, Shropshire into talking with the Innocence Project.

Next, the petitioner has not provided a reason why the court should credit Shropshire's 2013 statement—which was not made under oath or penalty of perjury—over the sworn version of events he provided at the 1978 trial. In general, the Seventh Circuit views witness recantations skeptically. See United States v. Griffin, 84 F.3d 912, 929 (7th Cir. 1996); Olson v. United States, 989 F.2d 229, 231 (7th Cir. 1993) ("It is a truism that our courts treat recantations with skepticism."); United States v. Kamel, 965 F.2d 484, 494, n.25 (7th Cir. 1992) ("Recanting affidavits and witnesses are viewed with extreme suspicion."). Here, the length of time alone—thirty-five years—between Shropshire's sworn trial testimony and his unsworn, possibly pressured

recantation make the court (like the Wisconsin Court of Appeals before it) skeptical of the truth of Shropshire's 2013 statements.

ii.    *Charles Hart's 1991 and 2014 affidavits*

Charles Hart's 2014 affidavit contradicts his 1991 affidavit. In his 1991 affidavit, Hart attested that the petitioner was innocent of the crime because Hart and Shropshire left the petitioner at a 17th Street filling station—the equivalent of stating that the petitioner never was at the scene of the crime. Dkt. No. 19-14. Twenty-three years later, Hart's 2014 affidavit placed the petitioner at the Great Western Liquor store, but asserted that Hart and Shropshire alone came up with the plan to rob the store. Dkt. No. 5 at 62. In Hart's 1991 affidavit, he provided no details of who shot the store clerk, but said that "Herbert Shropshire never saw a gun on [the petitioner's] person in the year of 1976." Dkt. No. 19-14. In 2014, Hart's affidavit adds numerous details to his prior version of events (suspicious, given that his memory likely would have been better in 1991 than in 2014), and attested that the store clerk was shot accidentally with his own gun after the clerk and Shropshire had a struggle. Dkt. No. 5 at 63. Hart also said in 2014 that neither Hart nor Shropshire nor the petitioner had a gun when they entered the liquor store, id.; he failed to mention this critical detail in his 1991 affidavit.

Again, the court is skeptical as to the truth of Hart's statements—either in 1991 or in 2014.

### iii.    *Springfield 2008 Affidavit*

Mark Springfield's affidavit either is contradicted by—or rebuts little of—the State's evidence at trial. Springfield said that the petitioner never displayed weapons inside Howze's house. Dkt. No. 5 at 65. Howze herself, however, testified at trial that the petitioner *did* have a weapon at her house. Springfield said that he did not hear the petitioner discussing robberies with Shropshire and Hart, id., but at trial, Shropshire testified that a conversation took place between the three of them in a bedroom. Springfield said that he "later learned in life [the petitioner] did not have anything to do with Gervis [M]yles' death[,]" id., but he does not explain how he learned this information.

The court cannot credit Springfield's statement to the extent that it demonstrates the petitioner's actual innocence.

### iv.    *Raymond Pullum's 2009 Affidavit.*

Pullum gave no details about the offense in his affidavit; the affidavit simply asserts that Charles Hart told Pullum that the petitioner was innocent. Dkt. No. 5 at 66. As the Wisconsin Court of Appeals noted, the Pullum affidavit is repetitive of Charles Hart's statements from 1991 and 2014. It is hearsay—Pullum was not at the liquor store or at Howze's house, and had no personal information about the crime. It is unlikely that a trial court would have allowed Pullum's testimony at trial. The Pullum affidavit does nothing to demonstrate the petitioner's actual innocence.

v. *Petitioner's 2014 affidavit*

Finally, the petitioner submitted his own affidavit, dated October 3, 2014. Dkt. No. 5 at 74-75. He attested that he went to the Great Western Liquor Store with Hart and Shropshire to buy more alcohol and that Hart and Shropshire never included him in their plan to rob the store. Id. at 74, ¶¶3-4. He said that "Gervis Myles was shot by his own gun. Neither Charles Hart, [the petitioner], nor Herbert Shropshire had a gun when we entered into the Great Western Liquor Store in May, 1976, to buy some liquor." Id. at ¶6. He later elaborated that "Herbert Shropshire was grabbed by Gervis Myles and a struggle took place and Myles was accidentally shot in the process as a natural and probable consequence of the attempted theft to steal money from behind the cashier counter." Id. at 75, ¶9. As for the gun that got dropped between the bushes, the petitioner asserted that "Hart told me that Herbert Shropshire told him that he dropped the gun; the gun that he needed me to go get it." Id. at ¶8.

The petitioner's own affidavit is more suspect than those of the other four individuals. It is not consistent with any other single account of what happened at the liquor store (although it has bits and pieces from other accounts). A reasonable jury would have good reason to question the petitioner's motive for making the statements he made in the affidavit.

vi. *Analysis*

The affidavits and the Lichstein "investigation memo" do not meet the stringent standard required for showing actual innocence. As the court noted, it appears that, rather than wanting to "get something off his chest,"

Shropshire talked to the Innocence Project because he was pressured to do so by the petitioner's family members.

The petitioner asserts, and the Lichstein memo says, that Shropshire testified at trial in order to "save his own butt." Dkt. No. 5 at 61. The 1978 trial jury knew that—Shropshire testified to as much at trial. He told the jury that in consideration for his trial testimony, he was receiving leniency from the district attorney's office. Dkt. No. 19-13 at 151-52. (Shropshire stating that he received consideration from the District Attorney's office for testifying and that "the consideration was that my charges -- my charges were dropped down to third degree murder and attempted armed robbery.").The jury heard about this reason to discount Shropshire's testimony, but found the petitioner guilty.

The petitioner's "actual innocence" evidence also contradicts itself. The version of events that Shropshire provided Lichstein in 2013 clashes with the affidavits from Hart and Harris, the other two people who were at the liquor store in 1976. The Shropshire memo says that the store clerk grabbed *the petitioner* around the neck and that Hart shot the clerk in the head. Dkt. No. 5 at 61. The 1991 Hart affidavit says that the petitioner never entered the Great Western Liquor Store, staying at a 17th Street filling station. Dkt. No. 19-14. The 2014 Hart affidavit says that the store clerk grabbed *Shropshire*; that the store clerk "was accidentally shot in the head" (without identifying who pulled the trigger); that neither Shropshire, Hart nor the petitioner had a gun upon entering the store; and that Shropshire left the store with a gun. Dkt. No. 5 at 63. The petitioner's 2014 affidavit says that the clerk grabbed *Shropshire* and

that "Myles was accidentally shot in the process as a natural and probable consequence of the attempted theft[.]" Id. at 75.

At trial, the primary witnesses were Shropshire, Elnora Howze and Donald Carter. The jury heard all three of these witnesses testify that the petitioner owned a gun and kept a gun at the Howze home. The jury heard Howze and Carter testify that the petitioner asked them to go retrieve a gun that he had dropped in the bushes. The jury could have viewed this testimony as corroboration of Shropshire's testimony that he saw the petitioner carrying a gun while leaving the Great Western Liquor Store. The jury heard testimony that the petitioner described to Donald Carter, in detail, where the gun was. The natural inference is that the petitioner knew where the gun was because he had carried it and he had dropped it.

In contrast, Shropshire told Lichstein in 2013 that at nighttime—perhaps the night after the robbery—the three men drove from Howze's house to Lake Michigan, where they walked out onto a long pier and Hart threw the gun into the lake. Dkt. No. 5 at 61. Shropshire said he didn't know anything about anyone dropping or throwing a gun into bushes. Id. In his 2014 affidavit, Hart attested that Hart asked the petitioner to go get the gun that Herbert Shropshire dropped. Id. at 63. Hart says he then asked the petitioner to have his girlfriend, Ms. Howze, retrieve the gun. Id. The petitioner tells a similar story in in his affidavit. Dkt. No. 5 at 75.

There are, therefore, three different stories about what happened to the gun—the petitioner had it and dropped it in the bushes; Hart threw it in the

lake; and Shropshire dropped it in the bushes. Conflicting stories from three men who each had a role in what happened at the liquor store that afternoon do not demonstrate that the petitioner is innocent.

The same is true about what happened inside the store. There are several different versions of who grabbed the clerk, who pulled the trigger—even who was in the store. The witnesses contradict each other. They contradict themselves. There is no consistent theme or pattern to provide a reasonable juror with a reasonable doubt.

There is also the issue of time. The trial took place a couple of years after the events at the liquor store, when witnesses were younger and memories fresher. Each statement or affidavit the petitioner has collected over the years has come from someone more removed in time and memory from the events. The likelihood that reasonable jurors would credit the testimony Shropshire or Howze or Carter would give in 2018 over the testimony they gave in 1976 is minimal.

Finally, the petitioner's affidavits and statements do not address the fact that several of the witnesses from the original trial have *not* changed their stories. The testimony of Howze and Carter remains incriminating, and has not been recanted.

The petitioner simply has not presented the kind of evidence courts have accepted as sufficient proof of actual innocence to allow a petitioner to defeat the statute of limitations bar. He has not produced an unbiased witness who puts him somewhere other than the scene of the crime—he, himself, admits he

was there. He has not produced fingerprint evidence, or receipts, or other reliable, credible evidence showing that he did not play a role in the robbery that led to Gervis' murder. Given that the petitioner was convicted of being a *party to a crime* to these offenses, the petitioner's evidence is even less persuasive. He did not have to come up with the idea of the robbery, or have the gun, or grab the clerk or pull the trigger in order for the jury to find him guilty as a party to a crime. That is the nature of Wis. Stat. §939.05, the Wisconsin statute that defines a party to a crime—a person may be charged and convicted "although the person did not directly commit [the crime]," and even if the person who *did* commit the crime has not been convicted.

The evidence the petitioner has presented falls short of showing actual innocence. Because he has not demonstrated actual innocence, the petition is untimely, and the court will dismiss it.

## III.     Motion to Appoint Counsel (Dkt. No. 11)

Because the court is dismissing the petition, the petitioner's motion to appoint counsel is moot. The court observes, however, that the petitioner presented his claims clearly and thoroughly, even though his claims involved several complex areas of federal *habeas* law. He presented substantial documentation supporting his claims. While he may have found his task easier if he had had a lawyer, the fact that he did not have one did not prevent the court from understanding his claims or his arguments.

## IV. Motion for Evidentiary Hearing (Dkt. No. 4)

The petitioner's motion for an evidentiary hearing also is moot. The court notes, however, that Rule 8 of the Rules Governing Section 2254 Petitions provides that it is up to the district court to determine whether an evidentiary hearing is warranted, after he or she has reviewed the answer, the transcripts and the records from the state-court proceedings. In this case, the court reviewed all of those things and more. The issues regarding the timeliness of the petition, equitable tolling and actual innocence were legal issues which the court could decide—and has decided—based on the pleadings and the parties' supporting documentation. No evidentiary hearing was necessary.

## V. Summary

All four claims in the May 11, 2017 petition were untimely. There is no basis for the court to equitably toll the statutory limitations period in order to find the petition timely. The petitioner has not demonstrated "actual innocence," such that the court could ignore the untimely filing in order to avoid a manifest injustice. The court will dismiss the petition, and this case.

## VI. Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved

in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).

Here, the court declines to issue a certificate of appealability because the petitioner has not made a substantial showing that the grounds in his petition are timely; has not made a substantial showing that the court should equitably toll the statute of limitations; and has not made a substantial showing of his actual innocence. In a case challenging a thirty-nine-year-old conviction that has been considered multiple times by each level of the state courts, the court finds that reasonable jurists would not debate that the petition should have been resolved in a different manner.

## VII.    Conclusion

The court **DENIES AS MOOT** the petitioner's motion for evidentiary hearing. Dkt. No. 4.

The court **DENIES AS MOOT** the petitioner's motion to appoint counsel. Dkt. No. 11.

The court **GRANTS** the respondent's July 21, 2017 motion for an extension of time, *nunc pro tunc* to July 28, 2017. Dkt. No. 17.

The court **GRANTS** the respondent's motion to dismiss the petition as untimely. Dkt. No. 18.

The court **DENIES** the petitioner's motion for default judgment. Dkt. No. 20.

The court **DECLINES TO ISSUE** a certificate of appealability.

The court **ORDERS** that this case is **DISMISSED**, with prejudice.

Dated in Milwaukee, Wisconsin this 26th day of March, 2018.

BY THE COURT:

**HON. PAMELA PEPPER**
**United States District Judge**